**13**
CHRISTOPHER D. SULLIVAN (148083)
ROXANNE BAHADURJI (290117)
QUENTIN ROBERTS (306687)
**DIAMOND McCARTHY LLP**
150 California Street, Suite 2200
San Francisco, CA 94111
Phone: (415) 692-5200
Email: csullivan@diamondmccarthy.com
        rbahadurji@diamondmccarthy.com
        quentin.roberts@diamondmccarthy.com

Special Litigation Counsel for
Kimberly J. Husted, Chapter 7 Trustee

**UNITED STATES BANKRUPTCY COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISION**

| | |
|---|---|
| In re:<br><br>ECS REFINING, INC.,<br><br>     Debtor | Bank. Case No. 18-22453<br><br>Adversary No.<br><br>Chapter 7 |
| KIMBERLY J. HUSTED,<br>Chapter 7 Trustee for ECS Refining, Inc.<br><br>     Plaintiff,<br><br>     vs.<br><br>VAR TECHNOLOGY NORTH AMERICA INC.<br><br>     Defendant. | **COMPLAINT TO AVOID AND RECOVER TRANSFERS PURSUANT TO 11 U.S.C. §§ 547, 548, 549 AND 550 AND TO DISALLOW CLAIMS PURSUANT TO 11 U.S.C. § 502** |

Plaintiff Kimberly J. Husted as Chapter 7 Trustee of ECS Refining, Inc. ("Trustee" or "Plaintiff") hereby brings this action to avoid and recover transfers against VAR Technology North America Inc. ("Defendant") and to disallow any claims held by Defendant.

## I. **INTRODUCTION**

1.     Plaintiff Kimberly J. Husted is the duly appointed Chapter 7 Trustee of the Estate of ECS Refining, Inc. ("ECS" or "Debtor").

2.     Plaintiff seeks to avoid and recover from Defendant, or any other person or entity for whose benefit the transfers were made, preferential transfers of property that occurred during the ninety (90) day period prior to the commencement of the bankruptcy proceedings of ECS pursuant to sections 547 and 550 of the Bankruptcy Code.

3.     Plaintiff also seeks to avoid and recover from Defendant or any other person or entity for whose benefit transfers were made pursuant to sections 548 and 550 of the Bankruptcy Code any transfers that may have been fraudulent conveyances.

4.     Additionally, Plaintiff seeks to avoid and recover from Defendant or any other person or entity for whose benefit transfers were made pursuant to sections 549 and 550 of the Bankruptcy Code any transfers that were made after the Debtor commenced its bankruptcy case and which transfers were not authorized by the Bankruptcy Code or this Court.

5.     Plaintiff seeks to disallow, pursuant to section 502(d) of the Bankruptcy Code, any claim that Defendant has filed or asserted against the Debtor or that has been scheduled for Defendant. Plaintiff does not waive but hereby reserves all of her rights to object to any such claim for any reason, including, but not limited to, any reason set forth in sections 502 of the Bankruptcy Code.

## II. **THE PARTIES AND RELEVANT ENTITIES**

6.     Debtor is a Delaware corporation, formerly engaged in the business of electronics recycling. ECS's corporate headquarters was located in Santa Clara, California and the Debtor's largest facility was located in Stockton, California.

7.     By order of the Bankruptcy Court entered on September 28, 2018, Debtor's Chapter 11 petition was converted to Chapter 7 liquidation effective October 2, 2018.  Plaintiff is the Chapter 7

Complaint

Trustee of the Debtor's bankruptcy estate. Plaintiff has standing to file and prosecute the claims of the Debtor asserted herein on behalf of the Debtor's bankruptcy estate.

8.      Upon information or belief, Defendant was, at all times relevant, a vendor or creditor to or for the Debtor. Upon further information and belief, Defendant conducts business at 2330 Interstate 30, Mesquite, Texas 75150.

**III.    JURISDICTION AND VENUE**

9.      This Court has subject matter jurisdiction over this adversary proceeding, which arises under title 11, arises in, and relates to a case under title 11, in the United States Bankruptcy Court of the Eastern District of California ("Court"), captioned *In re ECS Refining, Inc.*, Case No. 19-22453-RSB, pursuant to 28 U.S.C. §§ 157 AND 1334(b).

10.     The statutory and legal predicates for the relief sought herein are sections 502, 547, 548, 549 and 550 of the Bankruptcy Code and Rules 3007 and 7001 of the Federal Rules of Bankruptcy Procedure.

11.     This adversary proceeding is a "core" proceeding to be heard and determined by the Court pursuant to 28 U.S.C. § 157(b)(2) and the Court may enter final orders for matters contained herein.

12.     Venue is proper in the Eastern District of California pursuant to 28 U.S.C. § 1409.

13.     Trustee consents to the entry of final orders or judgment by the Court.


**IV.    FACTUAL BACKGROUND**

A.      **ECS's Business**

14.     ECS was an electronics recycling company that was founded in 1980 by James Taggart and Kenneth Taggart ("Taggarts"). It started as a processor of post-manufacturing scrap and residues for original equipment manufacturers in Silicon Valley.

15.     As the electronics industry grew, ECS shifted its focus to processing post-consumer electronics as a vertically integrated electronics recycler. ECS provided recycling and asset disposition services. ECS processed materials common in the electronics recycling industry such as industrial equipment, networking and telecommunication devices, manufacturing waste residuals, and consumer e-scrap peripherals. ECS was also well known to handle data sensitive hardware such as servers,

Complaint

1　computers, laptops, and hard drives for major corporations and organizations. ECS typically made its

2　profits through its refurbishment and precious metal recovery of e-waste.

3　　　　16.　　　ECS had three primary sources of revenue: the SB 20 program, the end of life program,

4　and the AMS Program.

5　　　　17.　　　The SB 20 program, per California's Covered Electronic Waste recycling specifications

6　under Titles 14 and 27 of the California Code of Regulations, allows certified recyclers to be paid for the

7　recycling of cathode ray tube ("CRT") and non-CRT (flat panel) displays. If the reporting and processing

8　requirements were met, the California Department of Resources Recycling and Recovery paid ECS

9　within 90 days of a claim being submitted and was bound by state legislation to pay $0.49/pound for

10　approved pounds.

11　　　　18.　　　The end of life program involved collection and recycling of electronic products that

12　required processing and recycling because of age, security, or disposal reasons.

13　　　　19.　　　Through the AMS program, ECS sold refurbished electronics to various customers. It

14　also sold arranged items based on contract or statement of work. Material prices and fees were agreed

15　upon by both parties and were set as either fair market value ("FMV") or revenue-share agreements. With

16　FMV contracts, AMS purchased material at FMV and recognized service and destruction revenue when

17　the service was performed. With revenue share agreements, AMS did not earn revenue until the material

18　was refurbished and resold.

19　　　　**B.　　　SummitBridge Loans**

20　　　　20.　　　In February 2012, Bank of America, N.A. ("Bank of America") made a revolving loan to

21　ECS in the maximum principal commitment amount of $15,000,000 and a term loan in the maximum

22　principal commitment amount of $35,000,00.

23　　　　21.　　　Bank of America and ECS entered into that certain Credit Agreement dated as of February

24　6, 2012, and which was further amended on or about April 30, 2013, January 29, 2014, and April 24,

25　2015. ECS executed that certain Revolving Note in the maximum principal commitment amount of

26　$15,000,000 dated as of February 6, 2012, in favor of Bank of America and that certain Acquisition Term

27　Note in the maximum principal commitment amount of $35,000,000, dated as of February 6, 2012, in

28　favor of Bank of America.

22.　　Bank of America's loans were secured by ECS's property including equipment, inventory, goods, work in progress and fixtures, by way of, among others: Security Agreement dated as of February 6, 2012; Trademark Security Agreement dated as of February 6, 2012; Patent Security Agreement dated as of May 22, 2015; and Pledge Agreement dated as of February 6, 2012.

23.　　In approximately March 2017, Bank of America sold, assigned and conveyed the loans and corresponding loan documents to SummitBridge National Investments V LLC ("SummitBridge"). The loans assigned to SummitBridge are collectively referred to as the SummitBridge Loans.

24.　　On or about June 21, 2017, ECS entered into a Forbearance Agreement with SummitBridge, wherein ECS acknowledged events of default under the SummitBridge Loans. ECS also acknowledged that as of May 15, 2017, it owed SummitBridge the amount of $5,672,658 on account of the revolving loan and the amount of $19,898,446 on account of the term loan. SummitBridge agreed to forbear from exercising its rights through December 31, 2017.

**C.　　ECS insolvency**

25.　　In or around August 2017, ECS obtained a debt restructuring analysis which indicated that ECS's liabilities were $43 million and its assets $32 million. Its debts exceeded its assets.

26.　　Starting on or around October 2017, given the balance owed on SummitBridge's Loans, ECS through its professionals appear to have attempted to negotiate with SummitBridge.

27.　　By the beginning of December 2017, in addition to the debt that had come due to SummitBridge, ECS owed two of its largest suppliers nearly three million dollars.

28.　　SummitBridge was willing to provide ECS with funds, however, it requested additional equity in the Debtor in return. The Taggarts were not willing to invest their own money into the company, nor were they willing to give up control of the Debtor. On December 6, 2017, ECS informed SummitBridge that the "current shareholders are not interested in investing unless they have control [of the Debtor] and 40% each."

29.　　It was internally decided that ECS would not send information to SummitBridge that the lender could use "for an emergency Receivership or something [they did not] want."

30.　　While ECS's owners placated SummitBridge with potential settlement terms from December 2017 up until days before the bankruptcy filing, ECS's owners and professionals were

Complaint

developing ways to file bankruptcy and minimize ECS's assets that were secured by SummitBridge's Loans in order to "take out SummitBridge" and gain control of the company.

31.     On or about April 19, 2018, as SummitBridge and ECS appeared to be at an impasse, SummitBridge circulated a proposed order appointing a receiver to take control of ECS through a receivership process.

32.     On April 24, 2018, ECS filed its Chapter 11 petition.  Per the Emergency *Ex Parte* Motion for Order (1) Authorizing Debtor to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §364; (2) Granting Liens and Super Priority Claims Pursuant to §364; (3) Authorizing the Use of Post-Petition Cash Collateral Pursuant to 11 U.S.C. §363; (4) Scheduling a Final Hearing; and (5) Granting Related Relief ("DIP Loan Motion"), ECS painted the picture of the Debtor's poor financial condition.

33.     In the DIP Loan Motion, ECS noted that the Debtor's total liabilities were $32,888,318.41 of which $25,927,581.91 was secured debt and approximately $6,960,736.50 was unsecured debt.

34.     The DIP Loan Motion also stated that the Debtor's assets consisted of: machinery and equipment with a gross liquidation value of $3.0 to $4.5 million; intellectual property valued at approximately $19,720.92; $9,838,316.99, at book value, of property and equipment; $811,638.75, at book value of physical inventory; (iv) $7,129,561.34 at book value in receivables, pre-paid expenses, and other assets; and $0 in cash.  Debtor's liabilities exceeded its assets.

35.     The Debtor's schedules indicate that at the time of filing, the Debtor's assets totaled $7,364,882.00 and liabilities totaled $32,568,307.

**D.     Cash consumption**

36.     Prior to the Petition Date, the Debtor as a recycling company maintained business relationships with various business entities, through which the Debtor purchased, received, sold and/or delivered goods and services.

37.     During the ninety days before the Petition Date, that is between January 24, 2018 and April 24, 2018 ("Preference Period"), the Debtor transferred property either by checks, wire or ACH transfers, direct deposits or otherwise to various entities.  The Debtor drew upon its accounts to pay vendors, suppliers, and other creditors.

Complaint

38.     Upon information and belief, during the course of the business relationship, Defendant and the Debtor entered into agreements, evidenced by invoices, communications or other documents that concerned or related to goods and/or services provided.

39.     Defendant conducted business with the Debtor through and including the Petition Date. Debtor purchased and/or received goods and/or services from Defendant or otherwise held a debt owned by Debtor.

40.     Plaintiff has determined that Debtor made transfer(s) of an interest of the Debtor's property to or for the benefit of Defendant during the Preference Period ("Transfer" or "Transfers"). The details of each Transfer are set forth on Exhibit A attached hereto and incorporated by reference.

41.     During the Preference Period, ECS deliberately chose to consume virtually all of its existing cash by making payments to vendors and/or creditors, including Defendant.  Ninety days prior to the Debtor's bankruptcy, ECS made outgoing payments that exceeded $18.7 million.

42.     Cash consumption was irregularly high. On the morning of the Petition Date, James Taggart forwarded an email notification from Wells Fargo to Kenneth Taggart which stated that "Your Wells Fargo Business account has reached zero dollars."

43.     ECS through its professionals and insiders sought to create a cash shortage leading up to the Debtor's bankruptcy so that the Debtor would need cash on an urgent basis which would be funded by the Debtor's insiders – the Taggarts – on a super-priority basis and to the Debtor and SummitBridge's detriment.

**E.      Inventory Segregation**

44.     Coupled with the accelerated spending, the Debtor deliberately suspended processing inventory that was secured by SummitBridge's Loans.

45.     Despite having its full workforce employed, employees were instructed to segregate pre-petition inventory that was secured by SummitBridge's Loans and stop accepting new inventory to be processed.

46.     ECS made the decision to intentionally operate at less than full capacity, despite the fact that processing the raw goods inventory would have created accounts receivable and needed liquidity.

Complaint

47.    The company's net accounts receivables show a considerable decline in funds leading up to the bankruptcy:

      a.  $8.49 Million in January 2018;

      b.  $6.26 Million in February 2018;

      c.  $6.13 Million in March 2018; and

      d.  $4.02 Million in April 2018.

48.    ECS's inventory plummeted from $2.52 million in March 2018 to approximately $350,000 in April 2018.  Further, its net income loss went from ($1.56 million) in March 2018 down to ($4.4 million) in April 2018.

49.    As a direct result of the Debtor's rapid cash consumption and the decision to stop accepting and processing inventory, available cash for operations and account receivables were drastically reduced thereby making it impossible for the Debtor to operate solely on cash collateral and requiring a Debtor-in-Possession loan.

**F.    The insider DIP loan**

49.    On April 16, 2018, Jim Taggart wrote to an individual who knew of "a potential interested party in doing some DIP lending to ECS when [it was to] file for reorganization."   That same day, the referring individual emailed the potential interested lender with Jim Taggart copied and said, in part, "The impetus for the capital raise of $6 million + is a 'take out' of a private equity firm who purchased the underlying ECS debt from a bank.  The funds is slated for a total take out of the current private equity firm."

50.    In the DIP Loan Motion, the Debtor sought to obtain a $6.0 million loan from Butch and Sundance LLC ("BS"). As stated by James Taggart in his declaration in support of the reply to the opposition to the motion to dismiss the bankruptcy case, BS was formed by ECS's counsel eight days prior to the bankruptcy case.  The Taggarts were the only members and managers of BS.

51.    The Debtor and its bankruptcy counsel did not disclose to the Court that the DIP Loan was funded by the Debtor's insiders – the Taggarts. The DIP Loan Motion also concealed the fact that Debtor's largest landlords (Sinclair Partners, LLC and ECS Big Town, LLC), who were to be paid

approximately $140,000 per month from the proceeds of the DIP Loan, were also owned and effectively managed by the Taggarts.

52.    The Debtor and its bankruptcy counsel misrepresented to the court in the DIP Loan Motion that the "DIP Loan has been negotiated in good faith and at arm's length by the Debtor and the Lender" when in reality the Debtor's insiders were on both sides of the transaction.  Despite the fact that post-petition financing from insiders is subject to heightened scrutiny and examination, ECS and its counsel did not inform the court of the true nature of the financing transaction.

53.    The terms of the DIP Loan were neither fair nor reasonable to the Debtor or the estate. The amounts and obligations owed to BS had priority over any and all administrative expenses and all other claims against the Debtor. No proceeds from the DIP Loan could be used by the Debtor, any committee, or any trustee or estate representative to investigate, assert, or prosecute any claims against BS, and its "officers, directors, employees, agents, attorneys, affiliates, assigns or successors" including any actions arising under Chapter 5 of the Bankruptcy Code. This provision effectively prohibited the Debtor from investigating any claims against the Taggarts.

54.    On May 1, 2018, after the Court was informed of the true nature of the DIP Loan, the Bankruptcy Court stated that it was "troubling" and "striking" that BS was created a week before the Petition Date and that it was owned by the Debtor's principals and shareholders.

55.    The DIP Loan Motion confirmed the financial condition of the Debtor and strategic and substantial harm that was brought on to ECS.  The motion provides: "accounts receivable are not consistent enough to provide cash flow necessary for operations on a daily basis." Additionally, "There is no dispute that, without substantial post-petition financing, the Debtor will be forced to immediately cease business operations and engage in a fire sale of its assets…" Further, the "Debtor would have very little chance of avoiding an immediate shutdown of its business if not for the DIP Loan."

### G.    The Conversion to Chapter 7

56.    Given the Court's concern over the lack of disclosures and handling of the case, on May 8, 2018, a Chapter 11 Trustee was appointed.

57.    By October 2, 2018, the bankruptcy case was converted to a Chapter 7 under the

1    Bankruptcy Code.  The Court found that conversion to Chapter 7 was in the best interests of the creditors

2    and the estate.

3                                        **CLAIMS FOR RELIEF**

4                                             **COUNT 1:**

5                   **(Avoidance of Preference Period Transfers – 11 U.S.C. § 547)**

6            58.     Plaintiff re-alleges and fully incorporates the allegations pleaded above as if fully set forth

7    herein.

8            59.     As more particularly described on Exhibit A attached hereto and incorporated herein,

9    during the Preference Period, the Debtor made Transfers to or for the benefit of Defendant.

10           60.     Each Transfer constituted transfers of an interest in property of the Debtor.

11           61.     Defendant was a creditor at the time of each Transfer by virtue of supplying the Debtor

12   goods and/or services.

13           62.     Each Transfer was to or for the benefit of a creditor within the meaning of 11 U.S.C. §

14   547(b)(1) because each Transfer either reduced or fully satisfied a debt or debts owed by the Debtor to

15   Defendant.

16           63.     Each Transfer was made for, or on account of, an antecedent debt or debts owed by the

17   Debtor to Defendant before such Transfers were made, each of which constituted a "debt" or "claim" (as

18   those terms are defined in the Bankruptcy Code) of Defendant prior to being paid by the Debtor.

19           64.      Each Transfer was made while the Debtor was insolvent. Plaintiff is entitled to the

20   presumption of insolvency for each Transfer made during the Preference Period pursuant to 11 U.S.C. §

21   547(f).

22           65.     Each Transfer was made during the Preference Period, as set forth on Exhibit A.

23           66.     As a result of each Transfer, Defendant received more than Defendant would have

24   received if: (i) the Debtor's case were under chapter 7 of the Bankruptcy Code; (ii) the Transfers had not

25   been made; and (iii) Defendant received payments of its debts under the provisions of the Bankruptcy

26   Code.

27

28

                                                    10

67. As evidenced by the Debtor's schedules filed in the underlying bankruptcy case as well as the proofs of claim that have been received to date, the Debtor's liabilities exceed its assets to the point that unsecured creditors will not receive a full payout of their claims from the Debtor's bankruptcy estate.

68. In accordance with the foregoing, each Transfer is avoidable pursuant to 11 U.S.C § 547(b).

## COUNT 2

### (Avoidance of Constructive Fraudulent Conveyances – 11 U.S.C. § 548(a)(1)(B))

69. Plaintiff re-alleges and fully incorporates the allegations pleaded above as if fully set forth herein.

70. To the extent one or more of the Transfer(s) identified on Exhibit A was not made on account of an antecedent debt, was a prepayment for goods and/or services, Plaintiff pleads in the alternative that the Debtor did not receive reasonably equivalent value in exchange for such transfer(s) ("Potentially Fraudulent Transfers") and

    A. The Debtor was insolvent as of the date of the Transfer(s) or became insolvent as a result of the Transfer(s); or

    B. The Debtor were engaged, or about to engage, in business or a transaction for which any property remaining with the Debtor or for whose benefit the Transfer(s) was made was an unreasonably small capital; or

    C. The Debtor intended to incur, or believed it would incur, debts beyond its ability to pay upon maturity.

71. Based upon the foregoing, the each Potentially Fraudulent Transfer is avoidable pursuant to 11 U.S.C. § 548(a)(1)(B).

## COUNT 3

### (Avoidance of Unauthorized Post-Petition Transfers – 11 U.S.C. § 549)

72. Plaintiff re-alleges and fully incorporates the allegations pleaded above as if fully set forth herein.

73. To the extent any of the Transfer(s) identified on Exhibit A cleared the Debtor's accounts after the Petition Date, and such Transfer(s) were not authorized by the Court or the Bankruptcy Code

Complaint

("Post-Petition Transfers"), Plaintiff pleads in the alternative that such post-petition transfers are avoidable pursuant to 11 U.S.C. § 549.

### COUNT 4

### (Recovery of Avoided Transfers – 11 U.S.C. § 550)

74.     Plaintiff re-alleges and fully incorporates the allegations pleaded above as if fully set forth herein.

75.     Plaintiff is entitled to avoid each Transfer pursuant to 11 U.S.C. §§ 547, any Potentially Fraudulent Transfer pursuant to 11 U.S.C. § 548, and/or any Post-Petition Transfers pursuant to 11 U.S.C. § 549 (collectively, the "Avoidable Transfers").

76.     Defendant was the initial transferee of the Avoidable Transfers or the immediate or mediate transferee of such initial transferee or the person for whose benefit the Avoidable Transfers were made.

77.     Pursuant to 11 U.S.C. § 550(a), Plaintiff is entitled to recover from Defendant the Avoidable Transfers, plus interest thereon to the date of payment and the costs of this action.

### COUNT 5

### (Disallowance of all Claims – 11 U.S.C. § 502(d))

78.     Plaintiff re-alleges and fully incorporates the allegations pleaded above as if fully set forth herein.

79.     Defendant is a transferee of transfers avoidable under sections 547, 548, and/or 549 of the Bankruptcy Code, which property is recoverable under section 550 of the Bankruptcy Code.

80.     Defendant has not paid the amount of the Avoidable Transfers, or turned over such property, for which Defendant is liable under 11 U.S.C. § 550.

81.     Pursuant to 11 U.S.C. § 502(d), any and all claims of Defendant and/or its assignee, against the Debtor's estate must be disallowed until such time as Defendant pays to Plaintiff an amount equal to the aggregate amount of the Avoidable Transfer, plus interest thereon and costs.

WHEREFORE, Plaintiff prays for entry of judgment against the Defendant on the above claims for relief as follows:

Complaint

1      A.      On Plaintiff's First, Second, Third, and Fourth claims for relief, judgment in favor of

2    Plaintiff and against Defendant avoiding all of the Avoidable Transfers and directing Defendant to return

3    to Plaintiff the amount of the Avoidable Transfers, pursuant to 11 U.S.C. §§ 547, 548, and/or 549 and

4    550, plus interest from the date of demand at the maximum legal rate and to the fullest extent allowed by

5    applicable law, together with the costs and expenses of this action including without limitation attorneys'

6    fees;

7      B.      On Plaintiff's Fifth Claim for Relief, judgment in favor of Plaintiff and against Defendant

8    disallowing any claims held or filed by Defendant until Defendant returns the Avoidable Transfers

9    pursuant to 11 U.S.C. § 502(d);

10      C.      For such other and further relief as the Court may deem just and proper.

Dated: April 23, 2020              DIAMOND MCCARTHY LLP

By:    */s/Christopher D. Sullivan*
CHRISTOPHER D. SULLIVAN
Special Litigation Counsel for Plaintiff Kimberly J.
Husted, Chapter 7 Trustee

Complaint